# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with a cellular telephone number (330)-232-0667 that is stored at premises controlled by AT&T | ) ) ) ) ) ) ) Case No. **23MJ1164** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Southern__ District of __Florida__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 1343 and 1349 | Conspiracy to Commit Wire Fraud |
| 18 USC § 1956(h) | Conspiracy to Commit Money Laundering |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Courtney M. McGuire, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Courtney M. McGuire*
Applicant's signature

Courtney M. McGuire, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: __03/30/2023__

*Barbara L. Major*
Judge's signature

City and state: San Diego, California

**Barbara L. Major**
Hon. , U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Courtney M. McGuire, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a search warrant for: **AT&T**, a wireless telephone service provider headquartered at 11760 US Highway 1, 4th floor, North Palm Beach, Florida 33408, as described in Attachment A, to search the accounts associated with a cellular telephone number **(330)-232-0667** ("**Subject Account**") for subscriber information, telephone toll data, and cell-site geo-location information, for the period of July 1, 2020 up to and including and August 31, 2022. There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code, Sections 1349 and 1956(h), as more fully described in Attachment B. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), which applies to providers of electronic communication services. In this case, as will be shown below, AT&T provides electronic communication services in the form of cellular and wireless telephone service for the **Subject Account**.

## AGENT EXPERIENCE AND BACKGROUND

2. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI) since December of 2021. I am presently assigned to the FBI San Diego's Transnational Organized Crime – Global squad (TOC-G). This squad investigates money laundering and other derivative financial crimes committed by criminal organizations. Prior to my assignment with the TOC-G squad, I completed the 17-week FBI Academy in Quantico, Virginia and was trained in investigative techniques, procedures and strategies. Prior to my appointment as a Special

Agent, I worked for the FBI as a Tactical Specialist and administrative support employee for four years. As a Tactical Specialist, I conducted research and analyzed data in support of federal criminal and national security investigations. Prior to my appointment to the FBI, I served as a Jailer for the Laguna Beach Police Department in Laguna Beach, California. I have a Bachelor of Science degree in Biology from Boise State University.

3. As both a Tactical Specialist and a Special Agent with the FBI, I have participated in numerous investigations involving individuals of criminal organizations engaged in money laundering, drug trafficking, human trafficking and robbery. Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods used by criminal enterprises to collect and launder the proceeds from specified unlawful activity to include drug trafficking, interstate transportation of stolen goods, wire fraud and mail fraud.

**FACTS SUPPORTING PROBABLE CAUSE**

*Background on Romanian Organized Crime Group*

4. In September 2021, Romanian law enforcement provided information to the FBI regarding various organized crime groups coming to the United States from Romania to commit various frauds, swindles, and schemes, to obtain as much money as possible and then launder the funds back to Romania. In November 2021, the San Diego Police Department (SDPD) became aware of a series of felony theft related crimes targeting the elderly population in San Diego, believed to have been committed by Romanian organized crime groups.

5. Through a series of custodial interviews and search warrants for Facebook accounts used by members of the Romanian organized crime groups, investigators discovered a separate but overlapping wide-spread conspiracy to conduct wire fraud and fraudulently obtain unemployment benefits in California. This conspiracy was perpetrated by hundreds of members of Romanian organized crime groups, and was facilitated by SANDU.

2

*Background on California EDD*

6. The Unemployment Insurance ("UI") Program is a joint federal-state partnership administered on behalf of the U.S. Department of Labor by agencies in each state. In the State of California, the UI Program is administered by California's Employment Development Department ("California EDD").

7. On March 13, 2020, President Trump declared a nationwide emergency due to COVID-19, and in March 2020, the Families First Coronavirus Response Act (FFCRA) and the Coronavirus Aid, Relief, and Economic Security (CARES) Act provided additional funding for state UI agencies to respond to the COVID-19 pandemic. The CARES Act allowed states to expand the scope of workers who were eligible to receive state UI benefits, to extend the period of time for which workers could be eligible for UI benefits, and to allow workers who may have exhausted UI benefits under traditional programs to receive benefits.

8. The CARES Act further expanded the ability of states to provide benefits to unemployed workers by creating three new unemployment programs, namely, the Pandemic Unemployment Assistance (PUA) program, which permitted states to provide benefits to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular unemployment benefits, the Federal Pandemic Unemployment Compensation (FPUC) Program, which provided an additional amount in federal benefits to individuals collecting traditional UI program benefits, and the Pandemic Emergency Unemployment Compensation (PEUC) program, which provided additional weeks of benefits for individuals who had otherwise exhausted their entitlement to regular UI benefits (collectively referred to herein as "expanded pandemic UI benefits") PUA and FPUC benefits were 100% federally funded benefits paid through state UI agencies. To receive UI, PUA, PEUC, and FPUC benefits from a state UI agency, an applicant could file a claim, via the internet, with the state UI agency from which he was eligible to seek benefits.

3

9. California EDD provided unemployment insurance benefits for regular UI and expanded UI pandemic benefits to individuals whom California EDD determined were entitled to receive such benefits through debit cards, which were funded by California EDD and issued by Bank of America N.A.

10. California EDD's determination of whether the individuals were entitled to receive unemployment insurance benefits relied, in part, on confirmations from the employer (from which the individual has been recently unemployed) that the employee had worked with the employer.

11. Once a debit card for unemployment insurance benefits was issued, California EDD funded those debit cards by having funds drawn from the United States federal treasury in Washington, D.C., and wired those funds to Bank of America N.A.

12. Bank of America N.A. utilized debit processing services located in Colorado and Virginia to create accounts, load funds, and post payments for unemployment insurance debit cards. When a withdrawal was made from an account using a debit card, information was sent electronically to servers in Colorado and Virginia to post a debit to the account.

13. Between March and October 2020, over 8 million Californians filed for unemployment benefits. In light of the high volume of applications, on October 5, 2020, California implemented a new verification process for EDD through ID.me, which provided an automated process with a virtual in-person session with an ID.me representative, known as a "trusted referee," to quickly verify the identity of the applicant through a multi-step process using Artificial Intelligence and Human Intelligence together.

14. With the addition of ID.me, each applicant needed to complete a verification process before applying for benefits. Once the verification process was completed, they could re-enter the EDD portal and apply for benefits. The applicant would be given a "Confirmation Number" connected to their application for future reference.

15. Once approved for pandemic benefits, the recipient of the benefits would be required to periodically recertify under the penalties of perjury that, among other things, the recipient was unemployed due to the COVID-19 pandemic and therefore remained eligible to receive pandemic benefits.

*SANDU's Role In The Wire Fraud Conspiracy*

16. Based on an interview with a cooperating witness, and the review of social media search warrant returns, EDD applications and ID.me records, Investigators determined that SANDU developed a process to receive the most benefits possible by using fraudulent identifications, falsified utility bills, falsified earnings statements, falsified W2s, and fraudulent Health Insurance cards. He would also "backdate" or modify an EDD application with an earlier unemployment start date to generate additional fraudulent income.

17. In June 2022, cooperating witness F.T.[1] identified SANDU via his Facebook profile as the individual who assisted with F.T.'s fraudulent EDD application. Facebook returns associated with SANDU later confirmed for Investigators that SANDU had conspiratorial conversations on Facebook with individuals looking to fraudulently apply for EDD benefits or "backdate" their EDD applications.

18. SANDU applied for EDD four separate times, on September 18, 2020, July 10, 2021, July 13, 2021, and June 5, 2022. For the application submitted on September 18, 2020, SANDU received $3,600.00. On this application, SANDU listed his true social security number (SSN). Following the initial submission of the application, California implemented the ID.me process, as discussed below. On October 21, 2020, SANDU completed the ID.me process for that application. He provided a verification phone number of 330-232-0667 (the **Subject Account**). Investigators have determined that the Subject Account is serviced by AT&T Wireless. A records check was conducted that

---

[1] F.T. was detained in June of 2022 for suspicion of California Penal Code (PC) 186.10 (a) money laundering, PC 182(a)(1) conspiracy and PC 532(a) obtain money under false pretenses. F.T. waived his/her Miranda rights and provided a voluntary statement to law enforcement. F.T. was not promised anything in return for his/her cooperation and was ultimately released.

5

revealed that the phone number was associated with David CONSTANTIN, who investigators have determined is SANDU's brother and who is believed to have worked with SANDU to create fraudulent documents for applicants, as discussed herein. SANDU used different, and fraudulent[2], SSNs in each subsequent application.

19. In the application submitted on July 10, 2021, SANDU submitted a photograph of himself, a Maryland ID, and a W-2 showing he worked for Kraftsman Construction Co. According to California Franchise Tax Board records, Kraftsman Construction Co. does not exist. Despite this, SANDU's W-2 indicates payment of California State income tax using a fraudulent California State Identification Number for Kraftsman Construction Co. On July 10, 2021, SANDU also completed the ID.me process.

20. In the application submitted on July 13, 2021, which SANDU submitted under the alias Ionut Mihai, SANDU submitted a photograph of himself, a Washington state ID, a California state ID, and another W-2 from Kraftsman Construction Co. Investigators compared the supporting documents and photographs for "Ionut Mihai's" application to confirm the applicant's true identity to be SANDU. Additionally, SANDU participated in an ID.me verification session where he confirmed he was applying for California EDD benefits and received $26,250.00 for this application.

21. In the application submitted on June 5, 2022, SANDU again used a different SSN, submitted another W-2 from Kraftsman Construction Co., and a Maryland ID. SANDU did not receive benefits from this application.

22. Beginning in July 2021, SANDU and another individual sent public announcements via social media to a large network of co-conspirators, offering services or meetings to conduct the fraud. Co-conspirators communicated with SANDU via Facebook messaging or other electronic means, and/or met with him in person to provide

---

[2] In my training and experience, I know that a Social Security Number (SSN) is a nine-digit, unique identifier issued by the Social Security Administration to U.S. citizens, permanent residents, and temporary (working) residents. It is needed to work and is used to determine an individual's eligibility for Social Security benefits and certain government services. Most individuals have only one SSN.

6

their personal identifying information (PII). SANDU used PII provided by co-conspirators to create or have others create the fraudulent documents listed above, which SANDU then submitted in support of fraudulent EDD applications.

23.  Beginning in October 2020, EDD contracted with ID.me to assist in the identity verification of applicants. ID.me developed a process to verify supporting documents submitted by EDD applicants. As a result, applicants were required to participate in a recorded ID.me video verification session. Investigators reviewed many EDD applications using the ID.me verification process. A review of ID.me records identified four devices with specific device fingerprints[3] that were used to create and/or modify ID.me profiles that facilitated the verification of at least 137 fraudulent EDD applications for 137 different individuals. Investigators traced each of the four devices to SANDU and/or his assistant through conversations and EDD applications they created. Investigators also reviewed hundreds of ID.me verification sessions for SANDU's co-conspirators. On several occasions, SANDU and his assistant, were seen in the background of recorded ID.me video sessions for various co-conspirator EDD applications.

24.  Hundreds of EDD applications were reviewed by Investigators. They identified a significant number of consistencies across numerous supporting documents provided by applicants that reflected SANDU's reuse of resources in support of the scheme. For example, documents submitted in support of co-conspirators' applications listed the same names of businesses, Employer Identification Numbers (EINs), California State Identification Numbers, Blue Cross/Blue Shield member identification numbers, account numbers for Southern California Edison utility bills and passwords ("Romania221$") for almost all email addresses used to submit EDD applications. According to the California Franchise Tax Board, none of the companies in the various

---

[3] A device fingerprint is a unique identifier (aggregated hash value) associated with a user's device, from the hardware, operating system, audio stack, and its configuration. Browser fingerprinting refers to the process of collecting information through java script to create a fingerprint of a device.

7

W-2's submitted for conspirators' EDD applications were established companies in the State of California. Despite this, all W-2's submitted for conspirators' EDD applications indicate California State Income Tax withholdings by companies with fraudulent California State Identification Numbers. According to Blue Cross/Blue Shield and Southern California Edison, none of the member identification numbers or account numbers submitted in support of co-conspirators EDD applications were real.

25. In total, SANDU is believed to have conspired with at least 214 unnamed co-conspirators to fraudulently obtain no less than $5,207,687.00 in California Unemployment Insurance benefits. For his services, Investigators have determined that SANDU was then paid a fee by the individual co-conspirator, often ranging between $250.00 and $1,000.00.

   a. For example, social media returns showed that on July 14, 2021, A.G. communicated with SANDU via Facebook regarding EDD for his wife, T.G. On July 14, 2021, T.G. participated in a recorded video interview with ID.me, in which she identified herself by name and date of birth, and confirmed that she was applying for California EDD. A fraudulent Anthem Blue Cross/Blue Shield member ID was added to her ID.me account. On July 15, 2021, A.G. sent SANDU a Facebook message with the phone number 669-239-5640. Following this, SANDU sent A.G. a screenshot via Facebook message of an EDD application confirmation screen for T.G. with confirmation number 38022946. SANDU also sent A.G. via Facebook message the email address marta22121m@gmail.com and the password Romania221$. Also on July 15, 2021, SANDU received via Facebook message a falsified W-2 for T.G. from another individual. According to California Franchise Tax Board, the company listed does not exist in the State of California.

   b. According to EDD records, an application was submitted for T.G. on July 15, 2021, under the email address of marta22121m@gmail.com. The phone

8

number connected to the application was 669-239-5640, the same as the number provided by A.G via Facebook message.

c. On July 25, 2021, T.G. began receiving EDD benefits, ultimately totaling $27,000.00.

d. In October 2021, A.G. told SANDU he would be in San Diego, and they discussed money. Bank of America records show the money fraudulently obtained by A.G. and T.G. was withdrawn at ATMs in the Southern District of California, as well as in Oregon and other parts of California, including a $400.00 ATM withdrawal in Escondido, CA on August 4, 2021. Specifically, Bank of America ATM footage revealed A.G. withdrawing money from T.G.'s EDD account in California both by himself and with T.G.

e. In another example, on July 14, 2021, C.G. participated in a recorded video interview with ID.me, during which he confirmed that he was applying for California EDD benefits, and presented a fraudulent California driver's license. According to the California DMV, this drivers license number belongs to someone else. On July 15, 2021, SANDU sent C.G. a Facebook message indicating that he "needed a W-2". That same day, C.G. responded with a W-2 for his son, providing a SSN and photograph with the email address gioninebunuo@gmail.com, the password Romania221$, and the phone number 714-837-3249. An application for unemployment benefits was submitted to EDD for this individual, claiming to be a US Citizen, and being employed by Kraftsman Construction, on the same day.

f. SANDU sent the ID.me verification codes for both C.G. and his son to C.G., and on July 15, 2021 sent a facebook message to C.G. with a confirmation screen from EDD, confirmation number 38029477. On August 9, 2021, C.G.'s son began receiving $6,000.00 in EDD benefits. On August 29, 2021, C.G. began receiving $27,000.00 in EDD benefits.

9

    g. Bank of America records confirm C.G. withdrew $26,950 from ATMs in the Southern District of California, including $900 in Escondido, CA on September 23, 2021, as well as other parts of California. As of December 29, 2022, the account had a balance of $8.27.

26. Ultimately, Investigators have determined, based on cooperating witness interviews, financial records, social media search warrant returns, and the review of EDD applications and ID.me records, that between September 2020 and August 2022, SANDU conspired with over 214 individuals known and unknown to commit this wire fraud.

*SANDU's Laundering of the Money Obtained*

27. According to a review of Facebook messages between SANDU and co-conspirators, SANDU charged a fee between $250.00 and $1,000.00 for assisting individuals with submitting fraudulent EDD applications online. Based on Facebook messages, SANDU received payment for his services via counter deposit[4] and Zelle transfers. On multiple occasions via Facebook message, SANDU sent his Bank of America account and routing numbers to co-conspirators to conduct counter deposits into SANDU's bank account following an EDD payout. The following are examples of SANDU's means and methods for receiving funds obtained via EDD fraud from his co-conspirators.

    a. I.C. communicated directly with SANDU via Facebook message regarding EDD applications for himself and his wife, L.D. On July 10, 2021, L.D. fraudulently applied for EDD, and ultimately received $27,000.00. On September 2, 2020, SANDU sent his account and routing information to I.C. via Facebook message. I.C. responded to SANDU via Facebook message with a receipt for a $300.00 deposit. According to SANDU's bank account records, a $300.00 counter deposit was conducted on September 2, 2020.

---

[4] A counter deposit is referred to as a financial transaction at a bank branch in which an individual deposits money in person into a bank account.

10

b. On September 2, 2020, F.R. applied online for EDD benefits. F.R. received his/her first EDD payment on October 23, 2020 and received a large payment on November 4, 2020. A few days after the large payment, on November 11, 2020, SANDU sent F.R. his account and routing information. The following day, a $250 transfer was made into SANDU's account.

c. C.S. communicated directly with SANDU via Facebook message about EDD for himself and his wife, R.M. On July 31, 2020, C.S. applied online for EDD benefits. On December 26, 2020, R.M. applied online for EDD benefits. C.S. received an EDD payout on August 7, 2020 and R.M. received an EDD payout on December 30, 2020. On December 10, 2020, SANDU sent C.S his account and routing information via Facebook message. C.S. responded the same day with a photo of a Bank of America receipt confirming a $900.00 deposit. According to records for SANDU's bank account, a $900.00 counter deposit was conducted on December 10, 2020.

d. R.D. communicated directly with SANDU via Facebook message regarding EDD fraud on behalf of himself and four other individuals: M.D., A.M., A.D., and M.C.. In July 2021, three of the individuals fraudulently applied for and received EDD benefits. On September 29, 2021, M.C. received the group's final EDD payout. On the same day, R.D. sent SANDU five $500.00 Zelle transfers.

28. A review of records associated with SANDU's Bank of America account revealed numerous payments to a Remitly account[5]. Investigators' review confirmed that SANDU opened his Remitly account on September 11, 2020. The phone number listed on his account was (330)-232-0667 **(Subject Account)**. The e-mail address associated

---

[5] Open source research identified Remitly as a financial institution known for sending money abroad. As of March 28, 2023, Remitly marketed their business as "Remit Money Abroad – Remit Quickly". Based on my training and experience, individuals who have obtained money fraudulently, through illicit means and/or otherwise specified unlawful activity will often attempt to repatriate those funds to another country for the purposes of concealing the source and nature of the funds or to further promote specified unlawful activity.

11

with the account was constantinbobi@icloud.com. Separately, a review of SANDU's Facebook messages revealed conversations with I.T. regarding construction work on a house in Romania. I.T. sent SANDU numerous photos of a house in Romania, construction materials, invoices, and receipts from a Romanian home supply store. In response to the receipts, and invoices, SANDU responded with a screenshot of a Remitly transfer confirmation showing funds were sent from SANDU to I.T. According to records received from Remitly, between May 19, 2021 and August 14, 2022, SANDU sent 20 transactions to I.T. totaling more than $16,000.00.

29. In September 2022, Investigators learned SANDU returned to Romania. On October 25, 2022 and December 6, 2022, SANDU posted photos of himself and his family members in the vicinity of the aforementioned house in Romania. Additionally, Facebook comments indicated the house was owned or occupied by SANDU.

*SANDU's Statement of the Offense and Criminal Proceedings*

30. On February 27, 2023 Defendant, along with his wife and four children, was encountered by Border Patrol entering the United States illegally, approximately one mile west of the San Ysidro, California Port of Entry and approximately 100 yards north of the United States/Mexico International Boundary. Sandu was detained by Border Patrol and then arrested by the FBI on March 1, 2023.  On March 1, 2023, he agreed to waive his rights and speak to investigators. Among other things, he admitted to applying for EDD benefits, assisting family in applying for EDD benefits, and sending approximately $24,000.00 to a contractor in Romania to renovate his house. SANDU further admitted that he used a friend to obtain fraudulent W-2s, false identifications, fraudulent utility bills and fraudulent insurance cards for the purposes of applying for EDD benefits.

31. On March 2, 2023, a federal complaint was filed in the Southern District of California charging SANDU with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349. On March 28, 2023, SANDU was arraigned on an information charging him with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 and

Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h). He is currently pending those charges in Case No. 23-CR-0386-LAB.

## METHODOLOGY

32. Based on the facts above, there is reason to believe that SANDU committed illegal activities, and that SANDU used the **Subject Account** to communicate with each other for the purpose of conspiracy to commit wire fraud and money laundering. Additionally, given that people traditionally carry cellular phones on their persons and are rarely away from home without their cellular phones, I believe SANDU possessed this cellular device as he traveled and met with the 214 unnamed co-conspirators for the purpose of committing wire fraud and money laundering conspiracy. I believe that the **Subject Account** will produce evidence that provides further corroboration of these.

33. Based on my training and experience, and my consultation with other law enforcement officers, I am aware that AT&T Wireless routinely collects and stores data for the electronic communication accounts to which it and other providers issue telephone numbers. The data includes: (i) subscribers' contact and billing information; (ii) detailed information concerning subscribers' incoming and outgoing telephone calls; (iii) detailed information concerning subscribers' outgoing direct calls, text message, and SMS messages; and (iv) detailed information concerning cell-site geo-location data.

34. In particular, I know that cell phones connect to a provider's network through cell towers or cell sites. The particular tower or site may change as a phone moves from one location to another. Providers automatically record and retain this connection data as part of the subject account. Records and data identifying the towers or sites to which a phone connected therefore tend to identify the phone's and phone user's location at particular times.

35. Given these facts, I seek a warrant to search the **Subject Account** for the records and information in Attachment B.

# PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

36. The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Courtney M. McGuire*
Courtney M. McGuire
Special Agent, FBI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  30th  day of March 2023.

*Barbara L. Major*
HONORABLE **Barbara L. Major**
United States Magistrate Judge

14

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

AT&T hosts the electronic communication account associated with the telephone number (330)-232-0667 that is the subject of this search warrant and search warrant application (**Subject Account**). AT&T is an electronic communication service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at 11760 US Highway 1, 4th floor, North Palm Beach, Florida 33408.

# ATTACHMENT B
# ITEMS TO BE SEIZED

I. <u>Service of Warrant</u>

The officer executing the warrant shall permit the Provider in Attachment A, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. <u>Items to Be Seized</u>

Agents shall seize the following records, data, and information covering July 1, 2020 up to and including and August 31, 2022 and maintained by the Provider for the subject account identified in Attachment A:

a. Subscriber information, including:
   i. Names;
   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
   iii. Local and long distance telephone connection records;
   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
   v. Length of service (including start date) and types of service utilized;
   vi. Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
   vii. Other subscriber numbers or identities; and
   viii. Means and source of payment (including any credit card or bank account number) and billing records.

b. Records and other information about past wire or electronic communications sent or received by the subject account, including:
   i. the date and time of the communication;
   ii. the method of the communication;
   iii. the source and destination of the communication, such as the source and destination telephone numbers (call detail records), email addresses, or IP addresses; [and]

16

        iv. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data communications;

Which are evidence of violations of Title 18, United States Code, Sections 1349 and 1956(h).

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS**
**PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **AT&T**, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of **AT&T**. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of **AT&T**, and they were made by **AT&T** as a regular practice; and

b. such records were generated by **AT&T's** electronic process or system that produces an accurate result, to wit:

  1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **AT&T** in a manner to ensure that they are true duplicates of the original records; and

  2. the process or system is regularly verified by **AT&T**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
Date                                      Signature